UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 1:06-cr-0395 OWW |
| | ) | |
| Plaintiff, | ) | MEMORANDUM DECISION |
| | ) | REVERSING CONVICTION AND |
| v. | ) | AFFIRMING DENIAL OF RECUSAL |
| | ) | OF ENTIRE U.S. ATTORNEY'S |
| DARDEN BAUMAN, | ) | OFFICE |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.   INTRODUCTION

This matter is before the Court on the appeal by Darden Bauman from his conviction for three counts of violation of 36 C.F.R. § 260, which prohibits running at large of livestock in a National Park area.  The case was tried before the Magistrate Judge on May 23, 2006.  On June 22, 2006, Defendant filed a motion to determine whether the United States had to prove beyond a reasonable doubt that the Defendant willfully and intentionally violated the relevant regulation.  The Court denied the motion to dismiss August 1, 2006 and found Defendant guilty of all three counts charged.

Defendant timely filed a motion for new trial and for judgment of acquittal on August 8, 2006.  Those motions were

1

1  denied October 11, 2006.

2  Defendant was sentenced on November 8, 2006, to one year
3  supervised probation, a $2,400.00 fine, and three $10.00
4  assessments, totaling $30.00.

5  A timely notice of appeal was filed November 20, 2006.

## II.  FACTS

Defendant held a grazing permit issued by the United States Forest Service to Defendant for the Buck Rock Allotment. Defendant's family had been operating cattle in Sequoia National Forest since 1925. Defendant also was entitled to use a right of way to herd cattle through Kings Canyon National Park along Redwood Canyon Road (also known as the Redwood Saddle Road). The right-of-way included passage across the General's Highway onto Redwood Canyon Road. A separate statute, 36 C.F.R. § 7.8(d)(1) required that cattle be under control and on the roadbed at all times.

Evidence was adduced that trespassing cattle damaged park resources and presented a danger to Park visitors, including vehicular traffic. The National Park Service had been working historically to reduce the number of cattle incidents in the Park.

On September 1, 2004, Defendant was sent a letter referencing some 20 incidents of cattle trespass in the Grant's Grove subdivision of Kings Canyon National Park, 15 of which included cattle identified as belonging to Defendant. The letter stated that this number of trespass incidents was unacceptable, presented a danger to Park visitors, and that future violations

would cause the issuance of citations.

Prior to the citations, an illegal marijuana garden was discovered in the forest which had caused gates to be opened and cattle to be disrupted.  The Forest Service notified the Park Service that some of the cattle trespass incidents had been caused by individuals operating the marijuana gardens.  The marijuana gardens were eradicated during the week of September 15, 2004.

The three citations at issue concerned:

1.  September 27, 2004 four head of cattle with Defendant's Rafter D brand on their hip, were observed walking northbound on General's Highway approximately one mile south of the Wye within Kings Canyon National Park.

2.  October 11, 2004 eleven head of cattle, six bearing Defendant's Rafter D brand on their hips were observed approximately .9 miles south of the Wye in Kings Canyon National Park.

3.  October 22, 2004 cattle tracks leaving the General's Highway and traversing through upper Redwood Canyon Meadow resulted in eight cattle located at the turnoff for the Redwood Canyon trailhead in Kings Canyon National Park.  Of these eight cattle, a number had Defendant's brand on their hip.
These three incidents formed the basis for Bauman's convictions.

Evidence did not establish the personal participation in, presence at, direction by, or knowledge of Defendant as to any of the charged incidents.  The only evidence showed Defendant's agent, Kathy Williams, drove cited cattle on two occasions.  The evidence established that on the three citation dates, some

cattle bearing Defendant's Rafter D brand on the right hip were found off the roadway in the Park.

### III.  STANDARD OF REVIEW.

Upon appeal from the decision of a Magistrate Judge and a challenge to the sufficiency of the evidence to sustain a conviction, the Court considers the trial evidence in the light most favorable to the government to determine whether any reasonable trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *United States v. Arriaga-Segura*, 743 F.2d 1434, 1435 (9th Cir. 1983).  The District Court's review of the decision of a Magistrate Judge in a criminal case "is the same as in an appeal to the Court of Appeals from a judgment entered by a District Judge." Fed.R.Crim.P. 58(g)(2)(D).  Claims of insufficient evidence are reviewed *de novo*. *United States v. Shipsey*, 363 F.3d 962, 971 n.8 (9th Cir. 2004).

The standard of review in determining substantial evidence for a conviction is deferential, protecting the trier of fact's responsibility to resolve conflicting testimony, weigh the evidence, and argument presented. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The reviewing court must respect the province of the trier of fact by considering all evidence in the light most favorable to the prosecution and drawing all reasonable inferences in favor of the prosecution. *Wright v. West*, 505 U.S. 277, 296-97 (1992).  "A reviewing court faced with a record of historical facts that support the conflicting inferences must presume - even if it does not affirmatively appear in the record

- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. *Wright v. West*, 505 U.S. at 296-97. *See also United States v. Stanton*, 501 F.3d 1093, 1099-1100.

## IV.   LAW AND ANALYSIS

To convict Bauman of a violation of 36 C.F.R. § 2.60, the government had to prove beyond a reasonable doubt: (1) that the straying cattle belonged to Defendant; (2) the cattle were running at large, herded, driven across, allowed on, pastured, or grazing; (3) in a Park area; and (4) the Defendant knew of the regulation and failed to act to prevent additional violations.

The Court found that the regulation in dispute is a criminal statute because it is encompassed for penalty purposes by 36 C.F.R. § 1.3(a).

A.   <u>Violation of the Regulation</u>.

A dispute, not addressed by the Magistrate Judge's decision is whether § 2.60(a) required a showing that Defendant acted "willfully," i.e., purposefully, and not as the result of accident or mistake, by allowing his cattle to enter or be on National Park land where they were running at large, being herded, driven across, pastured, or grazing.  The government contended the offense was one of strict liability.  Defendant relies on *United States v. Semenza*, 835 F.2d 223, 225 (9th Cir. 1987).  In addressing an analogous statute, 36 C.F.R. § 261.7(a) which prohibits "[p]lacing or allowing unauthorized livestock to

enter or be in the National Forest System or other lands under Forest Service control," the Ninth Circuit held that § 261.7(a) is not as the government here argued, a strict liability offense without any mens rea requirement, but rather where a statute uses the word "allow," which has no rigid or precise meaning, the Ninth Circuit interpreted that term to mean "permit or suffer." Relying on *United States v. Launder*, 743 F.2d 686, 689 (9th Cir. 1984): words of "permitting or suffering" were "not the language of strict liability." Such terms "clearly require a willful act or a willful failure to act in the face of a clear opportunity to do so." 743 F.2d at 689. The Ninth Circuit found no reason why the analysis of the regulation should differ. Though, as here, proof showed that the livestock were on Forest Service land; that they were unauthorized; that the Defendant owned the livestock and had responsibility to control the livestock; an additional element was required. It had to be proved that the Defendant "willfully acted to allow his cattle to enter the National Forest, or willfully failed to prevent them from entering when he had a clear opportunity to do so."

In this record, there is no evidence that Mr. Bauman had any direct control over the cattle, that he was knowledgeable about where the cattle were on the three citation dates; whether he had any information concerning Ms. Williams' activities with respect to driving the cattle, or that Mr. Bauman had failed to bring the warning to the attention of Ms. Williams. The only "knowledge" of the regulation was the September 5 letter warning him against future violations of grazing or allowing cattle to be present in the National Forest. The Defendant relied on this failure of

proof to argue that absent the showing of purposeful action or inaction by Bauman in failing to control his cattle, that there was a failure of proof.  No evidence was presented that Ms. Williams had knowledge of the citations, what the circumstance of any of the alleged 20 prior trespasses were, or whether Ms. Williams had any involvement in any of the prior incidents. There is no proof that Bauman had any knowledge Ms. Williams could not control his cattle.  Bauman also argued that there was a total absence of evidence as to what Bauman did or failed to do in any respect as to the subject cattle.  There was no evidence that Bauman had any knowledge that Ms. Williams was driving cattle on any of the citation's dates or that he knew what she was doing with regard to control of the Bauman cattle.

Ranger Anderson was on duty September 27, 2004.  He came upon four head of cattle one mile south of the Wye intersection in Kings Canyon National Park.  He identified the four cattle as Bauman's by virtue of the Rafter D brand on the right rear hip of each cow.  No other relevant testimony was offered by Ranger Anderson.

Ranger Inouye testified that he was a supervising Ranger. That while on duty October 11, 2004, he saw ten cattle .9 miles south of the Wye.  Six of those cattle had the Bauman brand. Ranger Inouye offered no other testimony about the events of October 11.

Ranger Inouye testified that he was on duty October 22, 2004 and noticed several cattle tracks on the road.  He followed the tracks down the road where he saw eight cattle, four of which had the Rafter D brand on their right hip.  A gate was open, Ranger

Inouye followed the cattle through the gate, closed the gate, and then called dispatch to notify Mr. Bauman, who immediately responded to remove the cattle.  There was no testimony that the Defendant's cattle were "running at large," "herding," "driving across," or "allowing on, pasturing, or grazing."  Because there are alternative activities, including "allowing on," "herding," "driving across" "pasturing or grazing," which require knowledge and under Lander's analysis, purposeful action by the cattle owner, it cannot be ascertained from the record, which of these activities is the basis for the conviction.

Ranger Exline noted that Bauman's grazing permit for Forest Service Lands adjoining Kings Canyon National Park was in effect until December 31, 2005.  Chief Ranger Exline testified that he wrote a letter to the Acting Chief Ranger of Sequoia and Kings Canyon National Parks noting that Bauman had no control over whether the gates were left open, through which cattle passed, and that the operation of marijuana gardens in the area could have affected movement of the cattle.  Ranger Exline noted that Bauman was building drift fences to keep cattle from getting into the Park and was installing cattle guards.  There were between five and ten marijuana gardens operating before they were eradicated.  The testimony of Rangers Anslinger and Inouye was that if Bauman cattle were ever found that Mr. Bauman was immediately responsive and always removed his cattle from Park Service land. All of this is contrary to any purposeful violation.

Exhibit DD shows a lack of purposeful violation.  Government Exhibit 3, the letter of September 1, 2004 to Mr. Bauman from

Acting Chief Ranger Fauth alleges that 21 incidents in the year 2004 was completely unacceptable.  This evidence does show that Mr. Bauman was on notice that trespass incidents were occurring and he was requested to respond.

Based on the totality of the evidence, the fact that marijuana gardens, open gates, and other conditions beyond the control of Mr. Bauman intervened, coupled with the fact that the Magistrate Judge used a strict liability standard rather than requiring the element of willfulness, meaning purposeful conduct, to be proved, requires reversal of Defendant's conviction and a remand for trial.

Applying an erroneous legal standard to the elements of the crime results in prejudicial error requiring reversal.  The Court has reviewed a series of Tenth Circuit cases following *United States v. Unser*, 165 F.3d 755 (10th Cir. 1999) which recognizes the distinction between public welfare offenses, not recognized at common law, for which a mens rea requirement may not be required and crimes where Congress has not expressed a clear statutory intent to omit a mens rea requirement.  *Id.* at p. 762-63.  Where a federal criminal statute does not mention intent, ascertaining whether a mens rea requirement involves a matter of policy: where the standard imposed is under the circumstances reasonable and adherence properly expected; where the penalty is relatively small; where conviction does not "gravely besmirch" the reputation of the accused; where the statutory crime is not one recognized at common law, and the Congressional purpose can be construed as not requiring criminal intent; a denial of due process does not occur.  *Unser* at p. 762.  Protecting the safety

9

of the public in a National Park and the integrity of the Park and its resources is not a common law crime and is in the nature a public welfare offense. *United States v. Kent*, 945 F.2d 1441, 1446 (9th Cir. 1991) (unauthorized occupancy of National Forest land); *United States v. Larson*, 746 F.2d 455, 456 (8th Cir. 1984) (trespass by cattle); *United States v. Wilson*, 438 F.2d 525 (9th Cir. 1971) (cutting wood).

*Unser* found the unlawful possession and operation of a motor vehicle within a National Forest wilderness area to be a public welfare offense lacking a mens rea requirement because there was no mention of intent in the statute or regulations; the duty imposed was reasonable under the circumstances, and adherence properly expected; the statutory scheme was not one taken from the common law and the Congressional purpose is supportive; conviction does not gravely damage reputation involving only a misdemeanor and the penalty is relatively small. *Unser* specifically held that a misdemeanor carrying a potential fine of up to $5,000 or imprisonment of not more than six months, or both, can be a strict liability offense without a scienter requirement. *United States v. Corrow*, 119 F.3d 796, 805 (10th Cir. 1997), *cert. denied*, 522 U.S. 1133, 1133 (1998).

Even assuming, *arguendo*, that the violation of § 260.1 was a strict liability offense and purposefulness was not required, the evidence does not show Plaintiff had knowledge, participation in, or reason to believe his cattle would not be controlled by Ms. Williams.  The evidence is insufficient to prove the offense beyond a reasonable doubt.  Defendant's conviction must be REVERSED.

## V. **RECUSAL OF THE ENTIRE U.S. ATTORNEY'S OFFICE**
## **FOR PROSECUTORIAL MISCONDUCT**

The Magistrate Judge found that recusal of the United States Attorney's Office for the Fresno Division of the Eastern District of California for the United States Attorney's Office was not required based on his findings that:

1. Virna Santos, duly acting Assistant United States Attorney for the Eastern District of California, was the wife of Defendant's defense counsel, Kevin Little.

2. Mr. Little became ill before the date set for trial of the misdemeanor case and was not available for trial.

3. Ms. Santos took a leave of absence from her work to deal with Mr. Little's problems.

4. Ms. Santos went to the office of Mr. Little to assist with his cases.

5. Ms. Santos was present in the office when Cathy Williams, the agent of Mr. Bauman, called to determine the date, time and Judge for the misdemeanor trial.

6. Ms. Santos and Mr. Little had not discussed Mr. Bauman's case at any time prior.

7. Ms. Santos took the call from Ms. Williams about the upcoming trial.

8. Ms. Santos then looked through Mr. Little's Bauman defense file to find the trial date, time and Judge.

9. Ms. Santos had her husband's assistant place a second phone call to Ms. Williams.

10. Ms. Santos did not look at anything of substance in the Bauman defense file.

1      11.   Ms. Santos did not bring any information from the
2 Bauman file to the United States Attorney's Office.
3      12.   Ms. Santos had no information from the Bauman file to
4 share with the United States Attorney's Office.
5      13.   Ms. Santos did not discuss the Bauman case with any
6 other Assistant United States Attorney or member of the Fresno
7 Division United States Attorney's Office.
8      14.   Ms. Santos provided no information to the United States
9 Attorney's Office.
10     15.   Ms. Santos's action in looking at the file did not
11 cause any prejudice to Mr. Bauman.
12     16.   Based on the alleged prosecutorial misconduct of Ms.
13 Santos in communicating with Defendant's agent by telephone and
14 in looking at the defense file for Defendant's case, Defendant
15 sought to recuse the entire United States Attorney's Office for
16 the Eastern District of California.
17     17.   The Magistrate Judge denied the motion to recuse.
18        United States Attorneys are governed by ethical standards
19 set forth in 28 U.S.C. § 530B:
20        [a] An attorney for the government shall be subject to
           the State laws and rules and local Federal Court Rules
21        governing attorneys in each State where such attorney
           engages in that attorney's duties, to the same extent
22        and same manner as other attorneys in that State.
23        Defendant referred to 28 U.S.C. §§ 144 and 455 governing the
24 recusal of federal judges to argue that government attorneys
25 should be governed by the same standards.
26        The Magistrate Judge found that "whether an ethical
27 violation occurred, 'that is not an issue before this court.
28 That is an issue for the State Bar.'"  No examination was made

12

whether Ms. Santos's actions caused a conflict of interest to exist between herself as a member of the prosecutor's office in the Fresno Division of the Eastern District of California, and the Defendant.

District Judges have "substantial latitude in deciding whether counsel must be disqualified." *United States v. Steites*, 56 F.3d 1020, 1024 (9th Cir. 1995); *cited in U.S. v. Fraga*, 179 F.3d 793, 799 (9th Cir. 1999). Here, Ms. Santos, who stood in a privileged relationship with Mr. Little, as his wife, had no right to invade the attorney-client privilege between Mr. Bauman and his attorney Mr. Little. Ms. Santos told Ms. Williams, Bauman's agent, that Mr. Bauman had to get a new attorney; that Mr. Little could not handle Bruman's case; and that Ms. Williams could not talk to Mr. Little about the case. All of this conduct was entirely inappropriate for, as Ms. Santos knew, her law office, the United States Attorney's Office, represented the adverse party in this criminal case, the United States, against Mr. Bauman, her husband's client. Ms. Santos had an actual conflict of interest in communicating with the Defendant's agent, Ms. Williams, about any matter in the case and in looking at a privileged and confidential defense lawyer's client file in a case being prosecuted by Ms. Santos's government law office against that defense lawyer's client.

Title 28 Code of Federal Regulations § 77.2 subjects the Justice Department attorneys to the Rules of Professional Conduct in the State and the District in which the government attorney practices. California Rule of Professional Conduct 2-100 provides an attorney shall not communicate directly or indirectly

13

1  about the subject of the representation with a party the member
2  knows to be represented by another lawyer in a matter unless the
3  former lawyer has the consent of the opposing lawyer.
4       No evidence was adduced at the misdemeanor trial that Ms.
5  Santos ever had the consent of Mr. Little to look through his
6  file and/or to communicate with his client's agent, Ms. Williams,
7  who the evidence establishes handled all of Mr. Bauman's business
8  and legal matters.  Ms. Santos's law office was adverse to Mr.
9  Bauman and Ms. Williams.  Ms. Williams was acting with the
10 knowledge that Ms. Santos was Mr. Little's wife.  There are
11 material inconsistencies between the testimony of Ms. Williams
12 and the testimony of Ms. Santos adduced at the evidentiary
13 hearing held on the recusal motion below.  Ms. Williams testified
14 she told Ms. Santos that it was inappropriate for Ms. Santos to
15 be in Mr. Little's office; it was inappropriate for Ms. Santos to
16 talk to Ms. Williams; and that what Ms. Santos was doing was a
17 severe breach of ethics as Ms. Santos had never asked Ms. Flores,
18 an office assistant to Mr. Little, for the Bauman file.  The
19 Magistrate Judge found that Ms. Santos looked through the Bauman
20 file and talked to Ms. Williams about it, which was categorically
21 denied by Ms. Santos in her testimony, wherein she stated she had
22 not seen the file and had not looked through it.
23      There was a further dispute about whether Ms. Santos told
24 Ms. Williams that Bauman needed to get a new attorney, that
25 Bauman should just plead guilty and pay the fine because it would
26 be less expensive for him to do that than for him to hire another
27 attorney.  Ms. Williams so testified.  Ms. Santos denied she had
28 any discussions about the case with Ms. Williams.  There is a

dispute whether Ms. Santos discussed the nature of the charges, misdemeanor cattle trespass, denied by her, but testified to by Ms. Williams, that she was told that by Ms. Santos.  There is a further dispute in Ms. Williams' testimony that she in effect told Ms. Santos "you shouldn't be talking to me about this case." "You're not the lawyer of record."  All of which Ms. Santos categorically denied under oath.  A further issue surfaced that had the potential to prejudice Mr. Bauman, when Ms. Williams testified that Mr. Bauman did not understand court procedures, that he would be terrified and would not know what to do if Mr. Little was no longer Bauman's lawyer.  Information Ms. Santos denied receiving, although Ms. Williams stated that she told it to Ms. Santos.

More conflict occurred with respect to the second telephone conversation in which Ms. Williams testified that Ms. Santos called her and was extremely angry.  Ms. Santos categorically denied being angry or making the call.  Ms. Santos denied telling Ms. Williams that Kevin Little was ill and that Ms. Santos was making the decisions on his behalf.  Ms. Santos denied telling Ms. Williams that Ms. Santos stated she was deciding which cases Mr. Little would handle and which cases he would not.  Ms. Santos further denied telling Ms. Williams that the Bauman case was not a money-making case and that Mr. Little was doing the case as a favor to Mr. Bauman.  All of this was denied by Ms. Santos.

California Rule of Professional Conduct 3-320 prevents an attorney from representing a client in a matter in which another party's lawyer is a spouse, unless the lawyer informs the client in writing of that relationship.  Ms. Santos denied ever

15

purporting to represent Ms. Williams or Bauman.  The entirely of this unseemly dispute could have been avoided if Ms. Santos had refrained from looking at the file and communicating with represented parties, who were adversaries of her office.

Under the totality of these circumstances, Ms. Santos violated the Rules of Professional Conduct by having direct communication with an opposing party's agent about a case in which her office was the opposing lawyer.  She had no consent to do this.  She was purporting to make decisions that adversely affected the Defendant.  Her unilateral choice to tell Mr. Little's client that Mr. Little would no longer represent him, without communicating with Mr. Little, was equally inappropriate.  She did not call the State Bar, did not seek the intervention of any outside independent party having the competence to deal with this unusual situation.  She did not notify the Court as to her husband's illness, nor did she seek the assistance of the Federal Defender or any other professional qualified to address the circumstances of Mr. Little's inability to continue representing Mr. Bauman in this case.

In view of the total conflict in testimony and the Magistrate Judge's express finding that Ms. Santos was not credible about her review of the Bauman client file, Defendant argues that the appropriate remedy is that the entire United States Attorney's Office in the Eastern District of California be recused and that an independent prosecutor having none of the conflicts or disabilities created by Ms. Santos's conduct make the decision whether to retry the case.  There is no way of knowing whether or not any further actions or communications

16

within the United States Attorney's Office occurred as a result of Ms. Santos's conduct. That subject was not examined at the evidentiary hearing except for a conclusory statement. Ms. Santos denied being angry with Ms. Williams and denied raising her voice in a telephone conversation. Ms. Santos denied seeing any emails in the file. Ms. Santos was on leave from the United States Attorney's Office when she had the telephone conversation with Ms. Williams. Ms. Santos also discussed the case with her husband to the extent that he had told her that the case was a cattle trespass case on Federal land and that he was going to reduce the number of cases he was handling and the case of Mr. Bauman was one of them. No one asked Ms. Santos whether she ever discussed the Williams case with anybody else at the United States Attorney's Office, either before, during or after the time the case went to trial.

The appropriateness of the recual sought depends in large measure on the prejudice to Defendant from Ms. Santos's actions. The Magistrate Judge Found that although the conduct of Ms. Santos was inappropriate, that Defendant had not been prejudiced in any way.

Disqualifying the United States Attorney's Office is "a drastic measure and a court should hesitate to impose it except where necessary." *United States v. Bolden*, 353 F.3d 870, 878 (10th Cir. 2003). Disqualifying an entire United States Attorney's Office implicates separation of powers issues. *Bolden*, 353 F.3d at 876, *citing, Flanagan v. United States*, 565 U.S. 259, 268-69 (1984) (recognizing that disqualification of an entire United States Attorney's Office is almost always

17

reversible error).  *Bolden*, at p. 876.  It is not suggested that there are ethical violations by any other attorneys in the Fresno Division of the Eastern District United States Attorney's Office.  The government recognizes that recusal of an entire prosecutor's office to protect the integrity of the judicial process is rare.  *Chadwick v. Superior Court*, 106 Cal.App.3d 108, 117 (1980).  The California State standard for recusal of the prosecutor is: '[recusal] shall not be granted unless it is shown by the evidence that a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial."  *People v. Conner*, 34 Cal.3d 141, 147.  No evidence establishes that Mr. Little was available to try Bauman's case or that Ms. Santos wrongfully denied Bauman counsel of his choice.  A disqualifying conflict exists when the circumstances of the case show a reasonable possibility that the prosecutor's discretionary function may not be exercised in an even-handed manner.  *Conner* at p. 147.  Here, there are 17 criminal attorneys and 5 civil attorneys in the Fresno Office of the United States Attorney's Office.  There are two certified law clerks in the Misdemeanor Unit responsible for prosecuting this case.  None of these other persons communicated with or were influenced by Ms. Santos.  Bauman obtained a new attorney of his choice.

Although the conduct of Ms. Santos should never have occurred and was inappropriate, it was up to the Magistrate Judge to address whether further action was required.  His findings on the subject are supported by the facts and law.  The decision denying the motion to recuse the entire U.S. Attorney's Office is **AFFIRMED**.

## VI. CONCLUSION

For all the reasons stated above, Defendant's conviction of counts 1, 2 and 4 is REVERSED AND REMANDED for retrial within sixty (60) days.  Denial of Defendant's motion to recuse the entire United States Attorney's Office for the Eastern District of California is AFFIRMED.

IT IS SO ORDERED.

Dated:   December 10, 2009           /s/ Oliver W. Wanger
                                     UNITED STATES DISTRICT JUDGE